[No. 29493. Department Two. March 30, 1946.]

HOWARD HANFORD et al., *Respondents*, v. MAX GOEHRY et al., *Appellants*.[1]

[1]Reported in 167 P. (2d) 678.

*Joseph L. Hughes* and *Charles A. Johnson,* for appellants.

*Joseph Wicks,* for respondents.

ROBINSON, J.—In November, 1942, while Mrs. Charles Brown was driving an automobile belonging to her brother-in-law, Howard Hanford, it was struck by an overtaking car driven by Stanley Goehry, a twenty-year-old son of Max Goehry and Dee H. Goehry. Mrs. Brown was accompanied by Mrs. Wallace Rawley, and both were severely injured.

This joint action was brought against young Goehry and his father and mother, by the Browns to recover damages with respect to the injuries to Mrs. Brown, by the Rawleys to recover for Mrs. Rawley's injuries, and by Hanford to recover for the damages to his car. On account of the absence of Stanley Goehry in the armed forces, the cause was tried as against his father and mother only. At the appropriate time, they moved for a nonsuit and, at the close of all the evidence, for a directed verdict. The motions were denied, and the jury found verdicts in favor of Hanford and each of the plaintiff marital communities. The defendants then moved for judgment notwithstanding the verdicts and, in the alternative, for a new trial. Both motions were denied, and they prosecute this appeal from the judgment entered upon the verdicts.

The appellants do not question the amount of the verdicts; nor do they raise the question as to whether or not the injuries complained of were caused by their son's negligence. Although not admitting that he was at fault, they simply contend that, even if he was, they are not legally liable. It is, therefore, unnecessary to state the particulars as to the collision or the resultant injuries and damage, and we confine ourselves to the statement of those facts which have a bearing on the questions specifically presented by the appeal.

There are but two questions presented, and their nature may be clarified by quoting from the instructions given to the jury. Instruction No. 8 reads, in part, as follows:

"Before you can properly find Max Goehry and wife to be liable upon any of the three causes of action alleged in plaintiffs' bill of complaint, you must first be convinced by

a fair preponderance of the evidence of either of the following:

"First. That the car being driven by Stanley Goehry was furnished by Max Goehry as a family car—that is, for the general use, pleasure, and convenience of the Goehry family; or

"Second. That Stanley Goehry was at the time of the collision, on November 2nd, 1942, the agent of Max Goehry and was at that time engaged in his employment as such agent."

Appellants' first contention is that there was no evidence produced in the cause from which a jury could find as a fact that the car driven by their son was a "family car," nor any substantial evidence that he was the agent of the appellants; and they, therefore, assign that the court erred in overruling their motion for a nonsuit, in overruling their motion for a directed verdict, and again erred in refusing to grant their motion for judgment notwithstanding the verdicts.

Secondly, and in the alternative, they reassert that the evidence was wholly insufficient to prove that the car driven by Stanley Goehry was a family car, and since the court, in that portion of instruction No. 8 above quoted, permitted the jury to render verdicts for the plaintiffs if it found that it was, and it *may* have arrived at the verdicts on that theory, the court erred in overruling their alternative motion for a new trial.

In ruling upon the post-trial motions, the trial judge filed a most carefully considered memorandum opinion, stating the pertinent facts and his ultimate conclusions. Upon an examination of the record, we have found his summary of the facts to be so concise and accurate that we adopt it as the foundation for our discussion of the appellants' contentions:

"At all times in 1942 and for several years prior thereto, the defendant Max Goehry had been operating a garage and service station in Brewster, Washington. He was also a dealer in automobiles and auto trucks, and had continuously a more or less numerous assortment of new and used cars and trucks in his garage and on his used car lot. All through 1942 he had a car that was kept for the personal

use of himself and his wife, but that car was quartered in a private garage at their residence several blocks away, and was never kept or operated from the business garage.

"Stanley Goehry at the time of the collision (Nov. 2, 1942) was of the age of 20 years. . . . He had graduated from the Brewster High School at about 18 and shortly thereafter had gone out into the world on his own account. He had been in Seattle and vicinity for something more than a year prior to the fall of 1942. While over there in and around Seattle he had been working in various capacities and to some extent attending the State University. After leaving high school he had been earning his own way. He came back to Brewster about two months prior to Nov. 2, 1942, and his purpose in coming back was to work in the apple harvest. In addition to his garage and service station, his father had during that fall a contract of some sort for moving boxed apples from Brewster and vicinity to a warehouse or packing shed in Pateros, and all through October and up till and including the time of the collision on Nov. 2, 1942, Stanley was in the employ of his father and was boarding and rooming in the home of his parents in the town of Brewster. But according to the undisputed evidence he was paying regularly for his board and lodging there and was drawing regular wages from his father. The testimony showed that Stanley had a car of his own that he had brought with him when he came over from Seattle in September.

"Stanley's work at the time of the accident, and for at least a month previous thereto, had been to go every morning to Pateros, and his job was to help unload boxed apples as the same arrived there and put the same in the warehouse. What sort of a contract his father had for moving these boxed apples was not definitely revealed, but as far as it came to light the evidence indicated that Max Goehry had an agreement with the Beebee Cold Storage Company, (or some other fruit handling outfit using the 'Beebee' name) and he was hauling 'boxed apples' from Brewster down to Pateros, which is a distance of about 7 or 8 miles, and was delivering the same there into a warehouse or something of the sort. He was using at least one big auto truck, for the evidence showed that a truck of his, loaded with boxed apples, was on its way down to Pateros on the morning of the collision, and arrived at the scene of the collision very shortly after it occurred. Robert Goehry, a brother of Stanley's, was the driver of that truck. For about two weeks before the accident Stanley had been

using a Plymouth Coupe belonging to his father, his own car being laid up for repairs. This Plymouth Coupe was a motor vehicle that Max Goehry had among his collection of used cars at his garage, and was not the car kept for family use at the residence.

"Stanley left Brewster at about 7:00 A. M. on November 2nd, 1942, in this Plymouth coupe. With him were two other young men, Gorden Hess and Howard Gamble. The former had been for some time regularly employed on the job and had been going to work every morning with Stanley in this Plymouth coupe. But Howard Gamble had been hired by Max Goehry only the night before and was sort of extra hand,—employed to work for one day only. Stanley had picked him up at the Max Goehry garage at a few minutes before 7:00 that morning. These three young men we may infer composed what might be termed a crew of dry land stevedores. Their job was to stand-by on the platform at the Pateros end of the line and unload each truck of boxed apples that came in, and stow the same away wherever the fruit was to be stowed. Apparently these three composed the entire force of stevedores in the employ of Max Goehry in handling the Pateros end of his fruit moving contract, and we may infer the effects of the collision left him short-handed, for he made arrangements to close out his contract immediately following the collision."

It may not be amiss to add that Hess, one of Stanley Goehry's fellow workers, owned a car, and that there existed an arrangement between them that he should drive his car one week, taking Stanley with him to work, and Stanley should drive his the next week, taking Hess. This accident occurred during a week when Stanley was obligated to furnish transportation to Hess, and, his car having broken down, he was using a car belonging to the defendants. A third boy, Gamble, had ridden with them when he was working, but had quit working regularly to attend high school. He was with Stanley and Hess on the day of the accident, however, having been persuaded by Max Goehry to skip school that day because Mr. Goehry was in great need of an additional hand. It may be further noted that Stanley was paid only for the time spent in actual work at Pateros.

 From the above statement of the facts, it is appar-

ent that defendants were, at the outset, confronted by a strong and well-recognized presumption. It was an admitted fact that they owned the car driven by Stanley Goehry, and it is presumed, until the contrary is shown, that whoever is driving a vehicle is doing so for the owner. This was the rule in the horse and buggy days; *Knust v. Bullock,* 59 Wash. 141, 109 Pac. 329; and the rule is the same when the vehicle is an automobile. *Davis v. Browne,* 20 Wn. (2d) 219, 229, 147 P. (2d) 263.

This presumption is especially strong in the case at bar. It is in fact a sort of double-barreled presumption, because it is further an admitted fact that, at the time of the collision, Stanley Goehry was not only driving a car owned by defendants, but was also employed by them and was using it to get to his place of work, and moreover, was transporting two other of their employees to that place.

The leading case as to the function and effect of the foregoing presumption is, *Bradley v. S. L. Savidge, Inc.,* 13 Wn. (2d) 28, 123 P. (2d) 780. That case was decided by a sharply divided court (five to four) in 1942. We quote from the opinion:

"Departing, however, from the rule as heretofore declared in a number of our own cases to the effect that such presumption may be overcome only by *disinterested* testimony, and following what we conceive to be the correct rule as declared by the great weight of authority, including many decisions of this court, we now hold that the presumption may be overcome by competent evidence from either *interested or disinterested* witnesses, provided that their testimony is uncontradicted, unimpeached, clear, and convincing. When evidence of that degree and character is submitted by the defendant, the presumption disappears entirely from the case, casting upon the plaintiff the burden of producing *competent evidence* to meet the evidence of the defendant, and of establishing by a preponderance of the evidence the fact that, at the time of the accident, the driver of the offending automobile was the agent of the owner and was acting within the scope of his authority. If the plaintiff fails in that respect, the court is required, upon motion of the defendant, to direct a verdict in the latter's favor. The pronouncement of this rule requires and results

in the overruling of those cases, hereinbefore cited, which have proceeded on a contrary view."

The rule of the *Savidge* case has been reaffirmed by the unanimous departmental decision in *Carlson v. Wolski*, 20 Wn. (2d) 323, 147 P. (2d) 291, decided in 1944.

It is apparent, from the opinion handed down by the trial judge, in ruling on the post-trial motions, that he regarded the *Savidge* and *Wolski* cases as controlling authority; for, after citing them, he then went on to say:

"There being no dispute in this case but that the motor vehicle doing the damage belonged to the defendants, Max Goehry and wife, and it appearing that Stanley Goehry was at the time of the collision in the employ of said defendants, a presumption or inference arose that Stanley was operating that motor vehicle for the said defendants, and the burden was on the defendants to overcome that presumption or inference by uncontradicted, unimpeached, clear and convincing testimony. See last two cases above cited. [The *Savidge* and *Wolski* cases.]

"The above being the situation, it certainly was my duty to give the case to the jury as I did, and particularly as per Instruction No. 8."

This, under the circumstances, is, of course, equivalent to a direct statement by the trial judge that the presumption had not been overcome by evidence "uncontradicted, unimpeached, clear and convincing." But we must find that it was overcome by such evidence, if we are to hold that he erred in denying the defendants' motion for an instructed verdict, or in denying their subsequent motion for judgment notwithstanding the verdicts.

We are in as good a position as the trial judge was to determine whether or not the presumption was overcome by uncontradicted, unimpeached, and clear evidence. In our opinion, the evidence offered for that purpose was in fact uncontradicted and unimpeached. For the most part, it related to matters known only to Max Goehry and Stanley Goehry, such as why the car was furnished to Stanley, and that he was paid only for the time he worked at Pateros, and not for the time spent in going to and returning from the job, etc. It would normally be difficult to

contradict or impeach such evidence. The evidence is also clear, in the sense that it is not ambiguous—but is it convincing? The trial judge was not convinced. Reduced to its very lowest terms, the question for our decision on this branch of the case is: Can we say, as a matter of law, that he should have been convinced?

■ While the presumption could be overcome by evidence of interested witnesses, it is not only the special function, but also the statutory duty of the trial court, to carefully scrutinize the evidence of interested witnesses. The first sentence of Rem. Rev. Stat., § 1211 [P. P. C. § 38-3], reads as follows:

"No person offered as a witness shall be excluded from giving evidence by reason of his interest in the event of the action, as a party thereto or otherwise, but such interest may be shown to affect his credibility."

■ It is implicit in this statutory provision that the evidence of interested witnesses is subject to discount, but at what rate? This is a matter which a trial judge is much better qualified to determine than we can possibly be. A trial judge, in evaluating the testimony of a witness, observes and considers his general appearance, his behavior in the courtroom, his demeanor on the witness stand, and his manner of giving evidence, etc., and it would seem that such considerations would be especially strong factors in the evaluation of the testimony of an interested witness. The phrase "convincing witness" is frequently encountered in the law reports. While it is reasonable to suppose that the content of the evidence given by witnesses so-called was largely the cause of their being so designated, we have no doubt but that their appearance, demeanor, manner of giving evidence, etc., were, in most instances, the major factors involved. As to such matters, we who are asked to hold, on appeal, that the trial court should have been convinced, have no knowledge whatsoever.

The trial court was of the opinion that the presumption did not stand alone, but that there was considerable supporting evidence, over, above, and outside it; some, direct

in its nature, and some, of circumstances consistent with it. In another portion of his memorandum opinion, it is said:

"I feel that there was not only the inference but also a considerable lot of proof, both direct and circumstantial, to support the employment idea, and I do not feel like disturbing the verdicts if they can be considered as being based on that score. The jury apparently felt the defendants had not satisfactorily explained the situation."

There was undisputed evidence that Stanley Goehry was paid only for the time he actually worked at Pateros, and not for the time spent in going to and returning from his job; that, under his arrangement with Hess, he was obliged to transport him to Pateros; that, his car having broken down, his father loaned him a car; that his father had loaned cars to other people while their own cars were being repaired at his shop; and it is contended that his father's act in furnishing the car was, therefore, merely an act of accommodation; and that there is no ground upon which a jury could find that an agency was created, or that any such relation existed between Stanley Goehry and his parents, the defendants. But it is also established, by admissions or by undisputed evidence, that the defendant community had a contract to perform at Pateros; that Max Goehry, the agent of the community, employed three young men living in his vicinity, to do work at Pateros necessary for its performance, to wit, his son Stanley, Hess, and Gamble; that Mr. Goehry's need for an additional hand at Pateros was so great that, the night before the collision, he persuaded Gamble to skip school and work the next day; that, when the collision occurred, the three workmen were being transported to Pateros in a car belonging to Max Goehry and driven by his son.

In view of the fact that their transportation was necessary to forward the performance of the defendants' contract, was the jury compelled to believe that the sole and only reason Max Goehry furnished the car to his son was to enable the son to discharge his obligation to Hess? And,

furthermore, is the reason why the car was furnished absolutely determinative? The justification for the rule that a principal is liable for the torts of his agent, is that he presumably benefits from the work the agent is doing. There is not the least doubt but that the defendants benefited by having their son transport their workmen to Pateros. We think the trial judge was correct in feeling that, over and above the presumption, there was direct and circumstantial evidence to support the agency theory.

■ We are of the opinion that appellants, by introducing evidence on their own behalf, waived the right to assign error with respect to the court's refusal to grant a nonsuit at the close of plaintiffs' case. As to assignments Nos. 2 and 3, it is our opinion that the court did not err in sending the case to the jury, and in later denying defendants' motion for judgment notwithstanding the verdicts; and we, therefore, hold that these assignments are not well taken.

There remains the question as to whether the court erred in giving instruction No. 8, a portion of which has been heretofore quoted. In this instruction, the members of the jury were told that, if they found that Stanley Goehry was to blame for the collision, they might find his father and mother, the defendants, liable for the damages caused, if they should also

". . . be convinced by a fair preponderance of the evidence of *either* of the following:

"First. That the car being driven by Stanley Goehry was furnished by Max Goehry as a family car—that is, for the general use, pleasure, and convenience of the Goehry family; or

"Second. That Stanley Goehry was at the time of the collision, on November 2nd, 1942, the agent of Max Goehry and was at that time engaged in his employment as such agent." (Italics ours.)

To this, the following exception was taken:

"MR. HUGHES: Comes now the defendants and take exception to Instruction No. 8 as given by the Court, for the reason that the Instruction submits the question to the jury of liability of Max Goehry and wife on the grounds of the

family car doctrine; that the evidence submitted during the trial of the action was not sufficient to justify that question being submitted to the jury."

Appellants contend (1) that there was no substantial evidence that the car driven by Stanley Goehry was furnished by the defendant Max Goehry as a "family car"; (2) that it was, therefore, error to submit that issue to the jury; and (3) that, since the jury may have reached its verdicts on the family car theory, we cannot say that the error was not prejudicial.

■ It will be unnecessary to discuss the family car doctrine at length, in view of the fact that it has been thoroughly discussed, with full citation of previous decisions, in two comparatively recent cases: *Davis v. Browne,* 20 Wn. (2d) 219, 147 P. (2d) 263, and *Carlson v. Wolski,* 20 Wn. (2d) 323, 147 P. (2d) 291. We quote from the first of these cases:

"It has also been uniformly held in this state, ever since it was so decided in *Birch v. Abercrombie, supra* [74 Wash. 486, 133 Pac. 1020, 50 L. R. A. (N.S.) 59], that one who furnishes a vehicle for the customary conveyance of the members of his family, whether for business or solely for pleasure, makes the transportation of such persons by that vehicle his affair, that is, his business, and anyone driving the vehicle for that purpose with his consent, express or implied, whether a member of his family or another, is his agent. [Citing nine of our former decisions.]"

■ Proof that a car is a family car, under the doctrine as applied in this state, may be made in various ways, such as by showing that the head of the family expressly stated that he had purchased it for the use of the family or household, or that, having a car, he has expressly consented to its use by members of his family or household. But proof of continued use by the members of his household is sufficient. When that is shown, his consent is implied. But, in all cases, in order to fix liability under the doctrine, the foundation fact to be proven is that the head of a family has—to use the word somewhat loosely—dedicated the car to that use, that is to say, in the language of *Davis v. Browne,* and *Carlson v. Wolski, supra,* "for the customary conveyance of the members of his family."

■ We are unable to find any evidence in the record tending to prove that foundation fact. Mr. Goehry did have a car for that purpose which was kept in the garage at the family home several blocks from his place of business. He could, of course, have had more than one family car, but the car in question was one of several cars which he had bought, or taken in part payment for a car he had sold. It was kept at his place of business as an article of merchandise, awaiting sale or trade. There is no evidence that any member of his family had ever used it, or had been given permission to do so. The mere fact that Mr. Goehry permitted his son to use it while his own car was being repaired does not tend to prove that he furnished it for "the customary use of the members of his family," or even for the customary use of his son.

■ Appellants' contention that the court erred in submitting the family car issue to the jury in instruction No. 8 must, therefore, be sustained. In *Melton v. United Retail Merchants of Spokane, ante* p. 145, 163 P. (2d) 619, 629, decided but a few months ago, we quoted, with approval, the following excerpt from *Stokes. v. Magnolia Milling Co.,* 165 Wash. 311, 313, 5 P. (2d) 339, as follows:

" 'It has been repeatedly held by this court that, where the trial court, in submitting the case to the jury, submits an issue about which there is no controversy, or *upon which there is no substantial testimony,* such instruction is prejudicially erroneous. *Child v. Hill,* 149 Wash. 468, 271 Pac. 266; *Burge v. Anderson,* 164 Wash. 509, 3 P. (2d) 131. Other cases to the same effect might be cited, but there is no occasion here to multiply the citation of authorities upon a proposition which is definitely settled.' (Italics ours.)"

It, therefore, follows that it was error to instruct the jury that it could find for the plaintiffs upon the family car theory, and since, for all that we know, or can know, it may have arrived at its verdicts on that theory, it is obvious that the error may have been highly prejudicial.

The judgment appealed from is reversed and the cause

is remanded to the superior court of Okanogan county, with direction to grant defendants' motion for a new trial.

BEALS, SIMPSON, and MALLERY, JJ., concur.

BLAKE, J. (dissenting)—I think the judgment should be affirmed.